UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                   :

HOPETON MINOTT,                       :

                      Plaintiff,       :         11 Civ. 1217 (KPF)

                                     :

                 v.                  :       OPINION AND ORDER

                                     :

POLICE OFFICER JAMES DUFFY, *et al.*,   :

                                     :

                   Defendants.    :

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  April 8, 2014

KATHERINE POLK FAILLA, District Judge:

        This is an action under 42 U.S.C. § 1983, in which Plaintiff Hopeton Minott alleges that five New York City Police Department ("NYPD") Officers (collectively, "Defendants")[1] violated Plaintiff's constitutional rights by subjecting him to false arrest and malicious prosecution without probable cause.  Pending before the Court are the parties' cross-motions for summary judgment.  For the reasons set forth below, the Court grants Defendants' motion for summary judgment as to the false arrest claim levied against Defendants Sean Gelfand and Arlene Gonzalez, and otherwise denies the parties' cross-motions.

**BACKGROUND**

**A.    The Events of November 25, 2009**

        The accounts provided by Plaintiff and the individual Defendants are fundamentally contradictory in major and minor respects.[2]  This section will first

---

[1]     The individual Defendants are Police Officers James Duffy, Arlene Gonzalez, and Darryl Harris, and Sergeants Jose Brizuela and Sean Gelfand.

[2]     For convenience, the declarations in this case are cited using the convention "[Name] Declaration" or "[Name] Decl."; deposition transcripts are cited using the convention

lay out what all parties agree to be true, and then note in the following subsections the relevant testimony of each party where contradictions forbid easy summary.

### 1.   The Facts Not in Dispute[3]

On the morning of November 25, 2009, Plaintiff encountered an acquaintance in Brooklyn whose name is not clear, but whom both parties refer to as "Ra." (Def. 56.1(a) ¶ 3; Pl. 56.1(b) ¶ 3). Plaintiff drove Ra and a female acquaintance of Ra's, then unknown to Plaintiff but later identified as Shirley Lindsay, into Manhattan. (*Id.*; Def. 56.1(a) ¶ 19; Pl. 56.1(b) ¶ 19). Plaintiff drove into Manhattan and parked near a Chase Bank branch on Third Avenue between 31st and 32nd Streets. Lindsay left the car and entered the bank. (Def. 56.1(a) ¶ 9; Pl. 56.1(b) ¶ 9; Minott Dep. 44:15-16, 46:3-5). Plaintiff and Ra waited in the car for some time while Lindsay was in the bank. (Video 2 10:50:33–11:00:41 a.m.).

---

"[Name] Dep."; and briefs are cited using the conventions "[Party] Br.," "[Party] Opp.," and "[Party] Reply."

The facts throughout are drawn from Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1(a)"); Plaintiff's Local Civil Rule 56.1(b) Response to Defendants' Statement of Undisputed Facts ("Pl. 56.1(b)"); the Affidavit in Support of Search Warrant signed by Officer James Duffy ("Search Warrant Affidavit"); the criminal complaint ("Criminal Complaint") and the indictment ("Indictment") in which Plaintiff was charged; Plaintiff's Second Amended Complaint ("Second Am. Compl."); Defendants' Answer to the Second Amended Complaint; the transcript of the proceedings of March 16, 2010, in *People* v. *Hopeton Minott*, No. 5698/09 ("3/16/10 Tr."); the transcript of the proceedings of June 2, 2010, in *People* v. *Shirley Lindsay*, No. 5698/09 ("6/2/10 Tr."); and the Court's Opinion and Order of September 7, 2012 (the "September 7, 2012 Order" (Dkt. #30)). The Court also cites extensively to specific portions of the surveillance video from four different cameras inside the bank. Plaintiff provided this footage on a compact disc that contained one video file for each camera: 09.44.45_10.14.59.avi ("Video 1"); 09.44.47_10.14.59.avi ("Video 2"); 09.44.55_10.14.59.avi ("Video 3"); and 09.44.58_10.14.59 ("Video 4").

[3]   This account is drawn from the facts accepted by both parties, the surveillance video of the events, and documents in the public record.

At approximately the same time, an officer at the NYPD's 17th Precinct received a call from a bank employee regarding a possible unfolding crime. (Def. 56.1(a) ¶¶ 9-10; Pl. 56.1(b) ¶¶ 9-10). The officer was a member of a 17th Precinct anti-crime team, and the information was passed to other members of the team, comprising the individual Defendants. (Def. 56.1(a) ¶¶ 7, 9-10; Pl. 56.1(b) ¶¶ 7, 9-10). The content of this call is disputed. At a minimum, the informant advised that a young woman was attempting to cash a forged check. (Def. 56.1(a) ¶ 13; Pl. 56.1(b) ¶ 13). The informant may also have identified a second person during this initial phone conversation, as detailed more fully below.

As these events were playing out, Plaintiff left his car and went into the bank. (Def. 56.1(a) ¶ 16; Pl. 56.1(b) ¶ 16).[4] He attracted Lindsay's attention and spoke briefly with her before leaving the bank once again. (Video 2 11:00:41–11:01:07 a.m.). Lindsay returned briefly to the counter (Video 2 11:01:07–11:01:18 a.m.; Video 3 11:01:19–11:02:02 a.m.) before leaving the bank herself (Video 3 11:02:03–11:02:10 a.m.).

Meanwhile, the individual Defendants drove to the bank and parked. (Def. 56.1(a) ¶ 11; Pl. 56.1(b) ¶ 11). One officer entered the bank, spoke briefly with a

---

[4]   Plaintiff argues that video footage and Defendants' testimony both reflect that Plaintiff only entered the vestibule of the bank. (Pl. 56.1(b) ¶ 16). This is both a meaningless distinction and, in point of fact, untrue: a careful look at the video footage shows that Plaintiff unmistakably stepped over the dividing line from the vestibule into the main area of the bank and stood there for several seconds. (Video 1 11:00:47–11:00:55 a.m.; Video 2 11:00:47–11:00:55 a.m.). Irrespective of the hairs Plaintiff seeks to split here regarding the areas of the bank he entered, the undisputed fact remains that Plaintiff went into the bank and spoke to Lindsay.

bank employee, and then quickly left.  (Video 2 11:03:02–11:03:16 a.m.; Video 4 11:03:17–11:03:23 a.m.; Video 3 11:03:23–11:03:28 a.m.).[5]

Lindsay was apprehended in a nearby McDonald's restaurant.  (Def. 56.1(a) ¶¶ 18-19; Pl. 56.1(b) ¶¶ 18-19).  Questioned, Lindsay confessed that "a guy named Rod" (presumably the same individual referred to elsewhere as Ra) had given her the check and asked her to cash it (Def. 56.1(a) ¶¶ 21, 24; Pl. 56.1(b) ¶¶ 21, 24), and that "one of the guys" had driven her to the bank (Def. 56.1(a) ¶ 22; Pl. 56.1(b) ¶ 22).  The individual Defendant officers also stopped Plaintiff on the street, where Plaintiff told officers that he had driven the other individuals involved to the scene.  (Def. 56.1(a) ¶ 27; Pl. 56.1(b) ¶ 27).

Plaintiff and Lindsay were arrested and taken back to the precinct house, where Officer Duffy signed an affidavit in support of a search warrant for Plaintiff's and Lindsay's cellphones.  (Def. 56.1(a) ¶ 31; Pl. 56.1(b) ¶ 31; Search Warrant Affidavit ¶ 2).  The Affidavit contained Duffy's sworn testimony that:

- Duffy had seen Plaintiff, Lindsay, and an unapprehended male leaving the Chase Bank;

- Duffy had identified himself as a police officer, whereupon the three individuals ran away from the bank in different directions;

- A bank employee had informed Duffy that she had seen Lindsay, while trying to cash a counterfeit check, walk to the vestibule of the bank and speak with a tall, African-American male;

---

[5]     Two officers, presumably Harris and Duffy, returned to the bank approximately eight minutes later, where they conducted a longer conversation with a bank employee before once again leaving the bank.  (Video 2 11:11:05–11:11:23 a.m.; Video 3 11:11:16–11:12:52 a.m.; Video 2 11:12:47–11:13:01 a.m.).

- Lindsay had confessed to receiving the counterfeit check from a man named Rod; and

- Plaintiff had admitted to knowing the individual identified as Rod and to driving Lindsay to the bank.

(Search Warrant Affidavit ¶ 7).

Duffy also signed, that same day, a Criminal Complaint against Plaintiff prepared by an Assistant District Attorney.  (Criminal Complaint 1-2; Duffy Dep. 97:25-98:6).  The Criminal Complaint reflected Duffy's testimony that an employee of Chase Bank had observed Lindsay enter the bank with Plaintiff and an unapprehended male and attempt to cash a forged check while Plaintiff and the unapprehended male stood inside the bank; and that Duffy had observed Lindsay, Plaintiff, and the unapprehended male exit the bank and, on seeing Duffy, each run in a different direction.  (Criminal Complaint 1-2).

A New York State grand jury (the "Grand Jury") indicted Plaintiff and Lindsay on December 7, 2009, charging them with criminal possession of a forged instrument in the second degree and attempt to commit the crime of grand larceny in the third degree.  (Indictment).  Plaintiff remained incarcerated from his arrest on November 25, 2009, until he was able to post bond on January 6, 2010.  (Second Am. Compl. ¶ 17; Answer ¶ 17).

Two months later, the presiding judge in Plaintiff's case dismissed the charges against him because there was "not enough evidence against" him. (3/16/10 Tr. 2:6).  The judge explained her ruling by summarizing what she saw as the evidence before her: on the state's account,

> [Lindsay] attempted to cash a forged check at a bank and there was a point at her transaction with the teller that she left the teller and went to the vestibule, spoke to

5

> someone, allegedly [Plaintiff], and then came back. That was [Plaintiff's] entire involvement. I don't think that makes out a crime so that's the ruling.

(*Id.* at 2:11-17). Lindsay ultimately pled guilty to criminal possession of a forged instrument in the second degree. (6/2/10 Tr. 2:24-4:21).

### 2.   The Facts in Dispute

The following sections lay out the contradictory factual testimony provided by each party.

### a.   Plaintiff Hopeton Minott

Plaintiff testified that, after waiting for some time at the car, he went into the bank to tell Lindsay he needed to leave. (Minott Dep. 45:24-50:23). After leaving the bank by himself (*id.* at 49:21-22), he "went across the street to go back to the car" (*id.* at 51:1), whereupon he saw Lindsay "come out after me and [go] towards the … McDonald's" (*id.* at 49:19-20). Lindsay, he averred, did not walk with him at all. (*Id.* at 51:2-3). As he approached his car, two plainclothes police officers, one African-American and one Caucasian (*id.* at 53:1-2), seized him (*id.* at 51:24-52:14) and began asking him about "hustling checks" (*id.* at 52:19).

Plaintiff testified that, asked about his involvement, he told officers that he "gave a friend a ride" (Minott Dep. 53:13) and, when presented with Lindsay, informed officers that Ra, not Lindsay, was the friend in question, though acknowledging he had driven both (*id.* at 53:14-16). Officers took Plaintiff's car keys and began walking towards Ra who, as Plaintiff recounts it, fled on foot; one officer "jumped in [Plaintiff's] car and chased him." (*Id.* at 53:19-22).

6

### b.   Defendant James Duffy

Officer Duffy testified that, while in the vicinity of the precinct house, a member of his anti-crime team received a phone call from an employee of the Chase Bank involved in these events; he did not recall which officer received the call. (Duffy Dep. 16:3-20).  Four officers — Defendants Duffy, Gonzalez, Brizuela, and Harris — traveled in one car from the precinct house to the bank.  (*Id.* at 17:5-9).  Duffy testified that the phone call from the bank had alerted his team to "a female trying to pass a bad check" and that he had no information about any other individuals who might have been involved.  (*Id.* at 19:5-17).  After the team parked and left the car, Duffy recalled that Sergeant Brizuela crossed to the other side of Third Avenue, presumably to look for individuals who might be involved in an unfolding crime.  (*Id.* at 23:19-24:17).  Duffy testified that Brizuela never entered the bank.  (*Id.* at 20:18-21).  Duffy could not recall what Harris did at this point.  (*Id.* at 23:16-18).

Duffy, approaching the bank, saw a male and a female exiting the bank "walking together," as well as "other people in close proximity" to them.  (Duffy Dep. 25:17-19).  He thought the female might be the individual identified in the tip that brought Defendants to the scene, and that the male walking with her might also be involved.  (*Id.* at 26:3-10).  Duffy testified that, after he entered the bank with Officer Gonzalez, a bank employee described a female who tried to pass a forged check, and further described a tall African-American man and another individual to whom the young woman had spoken in the vestibule of the bank. (*Id.* at 26:20-27:17).  This description reminded Duffy of the two individuals he had noted on their way out of the bank when he entered.  (*Id.* at 28:8-17).

7

Duffy recounted that he and Gonzalez left the bank and "almost immediately" observed the woman he had seen leaving the bank; she matched the bank employee's description. (Duffy Dep. 30:3-7). Duffy and Gonzalez followed this woman, eventually identified as Lindsay, into a McDonald's, where they apprehended her as she left the bathroom. (*Id.* at 30:8-31:7). They asked her a few questions and, establishing probable cause that she was the individual identified by the bank employee, arrested her. (*Id.* at 33:14-22). During this questioning, Lindsay acknowledged that she had tried to cash a check she had been given by a man named Rod and that "one of the guys drove her" to the bank. (*Id.* at 33:7-13).

Duffy located Sergeant Brizuela and Officer Harris across the street where they had already stopped Plaintiff. (Duffy Dep. 34:9-22). Duffy was told that, in the interim, a third individual had fled the scene in a vehicle and Sergeant Brizuela had given futile chase on foot. (*Id.* at 36:6-17). Plaintiff, questioned, "offered up the name Rod" as someone involved in the day's events. (*Id.* at 41:13-18). Plaintiff acknowledged that he "grew up with" the individual named Rod whom police had failed to apprehend. (*Id.* at 104:12-17). Plaintiff also told Defendants that "all [Plaintiff] was doing was driving." (*Id.* at 104:5-9). Plaintiff was ultimately arrested at the scene and transported back to the precinct house with Lindsay. (*Id.* at 46:4-48:10).

Duffy, acting as the arresting officer, processed Plaintiff for arrest. (Duffy Dep. 47:13-16). This included creating the affidavit in support of a search warrant. (*Id.* at 60:13-69:19). Questioned about the content of the Search Warrant Affidavit, Duffy testified that he did not "recall if [Plaintiff] was running

or hastily walking" outside the bank (*id.* at 64:17-19), though the Affidavit indicates that Plaintiff and the other individuals ran away from the bank. Duffy also testified that the bank employee observed Lindsay speaking both to Plaintiff and a third individual in the bank during the attempted transaction, though the Affidavit did not reference that observation. (*Id.* at 67:13-17).

Duffy also provided the testimony used by an Assistant District Attorney to draw up the Criminal Complaint. (Duffy Dep. 97:16-105:23). Questioned about the content of the Criminal Complaint, Duffy testified that, as the Criminal Complaint itself indicates, the bank employee must have told him that she saw Lindsay enter the bank with Plaintiff and a second, unapprehended male, though he no longer had an independent recollection of receiving that information. (*Id.* at 99:24-100:16). Questioned about his testimony in the Criminal Complaint that he observed the three individuals identified therein "run in different directions," Duffy acknowledged that he "did not see them individually run," though he once again averred that he "saw them together prior to … entering the bank, and when [he] came out, they were separated." (*Id.* at 102:2-8). Duffy further insisted that he "observed two out of the three of them hastily walking, if not running"; he did not "recall the length of their stride." (*Id.* at 102:25:-103:3). He also testified that, entering the bank, the "unapprehended male" to whom the Criminal Complaint refers was "in close proximity to the two people … ultimately arrested," though he only saw "two of the three … apart" and did not "recall seeing the third person apart from" Plaintiff and Lindsay. (*Id.* at 103:14-25).

### c.   Defendant Daryl Harris

Officer Harris testified that he was away from the precinct, patrolling in an unmarked car, when he received a phone call regarding an unfolding crime either from another officer or directly from the bank employee. (Harris Dep. 16:8-17:24). In the car with him was another member of his team, though not the entire team; other officers were in a different car. (*Id.* at 17:10-14). Harris and the other officer in the car, whose identity he did not recall, responded to the bank. (*Id.* at 17:2-6, 18:17-19:10). After parking and leaving the car, Harris observed two people exiting the bank as he approached it on foot. (*Id.* at 24:6-10). "Based on the description that Officer Duffy" had provided to Harris before the officers arrived on the scene, Harris thought the two individuals he saw might be the individuals involved in the unfolding crime reported to police by a bank employee. (*Id.* at 24:11-15). He emphasized that, before arriving at the bank, he had received a physical description of two individuals. (*Id.* at 25:17-19).

Harris recalled that he and Duffy arrived at the entrance of the bank as the two individuals he had observed were "walking away together." (Harris Dep. 28:11-16). The two officers entered the bank together while Officer Gonzalez and Sergeant Brizuela, the other members of the team, took positions on the sidewalk at two different locations. (*Id.* at 28:21-29:7). Harris and Duffy entered the bank and spoke to an employee who described a single individual involved in the attempt to pass a counterfeit check. (*Id.* at 29:23-30:19, 31:5-25).

Exiting the bank, Harris could not see Lindsay (Harris Dep. 32:24-33:2), but could see Plaintiff across the street in conversation with Brizuela (*id.* at 33:9-20). Harris also observed Gonzalez indicate to Duffy that the female suspect had

entered a McDonald's.  (*Id.* at 34:8-16).  Duffy left to accompany Gonzalez into the McDonald's, while Harris crossed the street to join Brizuela in conversation with Plaintiff; during the ensuing interaction with the officers, Plaintiff was handcuffed.  (*Id.* at 35:6-22).  Shortly after separating from Harris, Duffy returned with Gonzalez, escorting Lindsay.  (*Id.* at 37:8-10).  Harris recalled Brizuela recounting that an unapprehended individual had fled in a car and escaped despite Brizuela giving chase on foot.  (*Id.* at 37:19-38:4).

### d.    Defendant Arlene Gonzalez

Officer Gonzalez testified that, on the day in question, she was out on patrol in an unmarked car with Officer Harris.  (Gonzalez Dep. 15:11-16:5).  Sergeant Brizuela called Harris and requested that Harris and Gonzalez come assist him at the Chase Bank.  (*Id.* at 17:8-13).  Approaching the scene in their car, Gonzalez observed Brizuela on the street standing next to Plaintiff, who had already been handcuffed.  (*Id.* at 21:4-22).  Harris left the car to assist Brizuela while Gonzalez parked the car.  (*Id.* at 22:24-23:3).  Gonzalez then left the car and joined Harris and Brizuela.  (*Id.* at 23:5-24:9).  Shortly after she arrived, Harris joined Officer Duffy inside the bank, leaving Gonzalez with Brizuela.  (*Id.* at 24:24-25:3).  Gonzalez herself never entered the bank.  (*Id.* at 33:20-22).

Harris and Duffy emerged from the bank and Harris returned to where Brizuela was standing with the handcuffed Plaintiff; Duffy turned north up Third Avenue towards the McDonald's, and Gonzalez joined Duffy as he went, leaving Harris to accompany Brizuela.  (Gonzalez Dep. 25:4-14).  Duffy and Gonzalez followed Lindsay into the McDonald's and arrested her.  (*Id.* at 26:16-34:5).

11

Significantly, Gonzalez was never told of the involvement of a third individual in connection with this incident.  (*Id.* at 41:22-42:6).

  **e.**  **Defendant Jose Brizuela**

  Sergeant Brizuela recalled that all four members of his team left the precinct on a routine patrol in the same car.  (Brizuela Dep. 26:24-27:2).  One member of his team, he testified, received a call from a Chase Bank employee regarding a crime in progress; he did not recall who.  (*Id.* at 28:2-8).  The team responded to the bank and parked on 32nd Street between Lexington and Third Avenues.  (*Id.* at 31:4-9).  On the street, Brizuela saw two individuals walking together who "were identified as [Plaintiff] and Lindsay"; the pair looked towards where Brizuela stood, spoke to each other, and separated.  (*Id.* at 33:12-16).  Brizuela followed Plaintiff across the street and Officer Gonzalez followed Lindsay, though Brizuela could specifically not recall why officers followed either individual.  (*Id.* at 34:6-13).  Brizuela also did not recall ever seeing Plaintiff running or walking "unnaturally fast."  (*Id.* at 67:25-68:6).

  Brizuela did not remember whether, at the time that he was following Plaintiff, Officer Duffy had yet entered the bank.  (Brizuela Dep. 34:18-20).  Ultimately, Officer Harris joined Brizuela and the pair ordered Plaintiff to stop.  (*Id.* at 35:16-36:2).  Duffy then alerted Brizuela and Harris that Plaintiff was involved in the crime, though Brizuela did not recall if Duffy did so in person.  (*Id.* at 36:12-25).

  Brizuela handcuffed and searched Plaintiff and found a set of keys; Plaintiff asked Brizuela to give the keys to a man standing beside a nearby car.  (Brizuela Dep. 40:3-19).  Brizuela approached the man, who "jumped in the car and sped

away." (*Id.* at 40:21-22).  Brizuela gave chase on foot but the fleeing man "was gone." (*Id.* at 41:4-13).  Brizuela did not remember whether Lindsay was brought to the location where he stood with Plaintiff.  (*Id.* at 46:8-13).

## B.   The Instant Litigation

Plaintiff filed the Complaint in this action on February 22, 2011, pressing four claims for relief: a catch-all claim under 42 U.S.C. § 1983; a claim for false arrest and false imprisonment; a claim for malicious prosecution; and a claim for respondeat superior liability against the City.  (Dkt. #1).[6]  Plaintiff filed a First Amended Complaint on May 20, 2011, with the same set of claims.  (Dkt. #4). Plaintiff filed a Second Amended Complaint on October 7, 2011, dropping the respondeat superior claim but retaining the other three claims.  (Dkt. #10).

On December 7, 2011, Defendants moved to dismiss the Second Amended Complaint.  (Dkt. #22; *see also* Dkt. #23-26, 28-29).  On September 7, 2012, the Court issued an Order granting in part and denying in part the motion to dismiss. Specifically, the Court dismissed Plaintiff's first, catch-all claim for relief under § 1983 as indistinguishable from his other, more specific claims; dismissed all claims against the City of New York for failure to plead allegations in support of those claims; denied the motion to dismiss Plaintiff's false arrest claim;[7] and dismissed Plaintiff's malicious prosecution claim against Defendants Brizuela, Gelfand, Gonzalez, and Harris.  Thus the surviving claims are Plaintiff's false

---

[6]   The case was initially assigned to the Honorable Paul G. Gardephe, United States District Judge for the Southern District of New York.  It was transferred to the undersigned on June 17, 2013.  (Dkt. #40).

[7]   The Court construed Plaintiff's claim for "false arrest and false imprisonment" as raising a single claim for relief.  *See* September 7, 2012 Order at 7 n.3; *see also Posr* v. *Doherty*, 944 F.2d 91, 96 (2d Cir. 1991).

arrest claim as to Duffy, Gonzalez, Harris, Brizuela, and Gelfand; and Plaintiff's malicious prosecution claim as to Duffy.

In a portion of the September 7, 2012 Order that is arguably relevant to the false arrest claim at issue in the pending motions, the Court concluded that allegations by a bank employee that "Lindsay attempted to cash a forged check, and that [Plaintiff] and another man had entered the bank with her and remained inside the bank during the aborted transaction," were insufficient to establish probable cause to arrest Plaintiff.  (September 7, 2012 Order at 9).  The Court reached out to examine additional allegations possibly supplying probable cause, and concluded that even were it to consider that Plaintiff had allegedly fled after seeing Duffy outside the bank and had said to Defendants that "all [he] was doing was driving," Defendants would still have failed to establish probable cause for arrest.  (*Id.* at 10-11 n.4 (finding that these facts were "'susceptible of an innocent as well as [a] culpable interpretation'" (quoting *People* v. *Torres*, 115 A.D.2d 93, 98 (1st Dep't 1986)))).  The Court also could not conclude that the officers had "arguable probable cause" and so declined to find that qualified immunity barred Plaintiff's claims at the motion to dismiss stage.  (*Id.* at 11-12).

With respect to the surviving malicious prosecution claim against Duffy, the Court limited Plaintiff's claim to "Duffy's swearing out of the criminal complaint." (Dkt. #30 at 19).  The Court acknowledged that, even when an indictment has been dismissed, New York law provides a presumption of probable cause for police action initiating a criminal prosecution once a grand jury has acted to indict the individual named in the complaint, which presumption can only be rebutted by proving that "'the indictment was produced by fraud, perjury, the

14

suppression of evidence or other police conduct undertaken in bad faith.'" (*Id.* at 17-18 (quoting *Colon* v. *City of New York*, 60 N.Y.2d 78, 82 (1983))).  The Court nonetheless concluded that this presumption "*may* not apply here" if the indictment was dismissed by the state-court judge "based on a 'total lack of evidence' as to one or more elements of the crime charged." (September 7, 2012 Order at 18 (quoting *Cox* v. *County of Suffolk*, 827 F. Supp. 935, 939 (E.D.N.Y. 1993) (emphasis added)).

## DISCUSSION

### A.   Applicable Law

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253,

256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

**B.    Application**

**1.    The Court Will Not Deem Admitted the Contents of Plaintiff's Local Rule 56.1(a) Statement**

Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules") provides:

(a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

(b) The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.

(c) Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

Local Rule 56.1. Both parties adhered to this rule with respect to Defendants' motion for summary judgment. With respect to Plaintiff's motion for summary judgment, however, Plaintiff filed a statement in accordance with Local Rule 56.1(a), but Defendants filed no responsive Local Rule 56.1(b) statement. Plaintiff submits in consequence that "[a]ll of [P]laintiff's facts must be deemed admitted by ... [D]efendants." (Pl. Reply 1).

It is clear that the Court has the discretion to deem Plaintiff's factual submissions to be admitted for the purposes of this motion under Local Rule 56.1(c). Conversely, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," and it may "in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement." *Holtz* v. *Rockefeller & Co., Inc.*,

258 F.3d 62, 73 (2d Cir. 2001) (quoting *Monahan* v. *New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)).  The circumstances here require that the Court exercise its discretion to do so: regardless of the formal requirements of briefing motions, disputed issues of material fact obvious from a careful examination of the record mandate that both motions be denied.  The Court will not rule on the basis of procedural irregularities when the substance of the case demands a different outcome.

### 2.   Summary Judgment Is Denied as to Both Parties on Plaintiff's False Arrest Claim, Except With Respect to Gonzalez and Gelfand

Defendants' motion for summary judgment is granted as to Officer Gonzalez and Sergeant Gelfand because of their acknowledged lack of personal involvement in Plaintiff's arrest.  Summary judgment is denied for both parties as to Officers Brizuela, Harris, and Duffy because issues of material fact remain.

### a.   Section 1983 Liability for False Arrest

Section 1983 provides a civil cause of action for damages on behalf of any individual who has been deprived of a right, privilege, or immunity secured by the Constitution or laws of the United States by a person acting under color of state law.  *See* 42 U.S.C. § 1983; *Sykes* v. *James*, 13 F.3d 515, 519 (2d Cir. 1993). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  *Thomas* v. *Roach*, 165 F.3d 137, 142 (2d Cir. 1999).

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New

York law." *Covington* v. *City of New York*, 171 F.3d 117, 122 (2d Cir. 1999) (quoting *Weyant* v. *Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  "Under New York state law, to prevail on a claim of false arrest a plaintiff must show that '[i] the defendant intended to confine him, [ii] the plaintiff was conscious of the confinement, [iii] the plaintiff did not consent to the confinement and [iv] the confinement was not otherwise privileged.'" *Gaston* v. *City of New York*, 851 F. Supp. 2d 780, 787 (S.D.N.Y. 2012) (quoting *Jocks* v. *Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003)).

"Under New York law, the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly* v. *Couch*, 439 F.3d 149, 152 (2d Cir. 2006).  "Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Torraco* v. *Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010).  In particular, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubt as to the person's veracity." *Feehan* v. *Lengyel*, 278 F. App'x 47, 49 (2d Cir. 2008) (summary order).

"'When determining whether probable cause exists[,] courts must consider those facts *available to the officer* at the time of the arrest and immediately before it,'" *Panetta* v. *Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quoting *Caldarola* v. *Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)) (emphasis in *Panetta*), "as '[p]robable cause does not require absolute certainty,'" *Panetta*, 460 F.3d at 395 (quoting *Boyd* v. *City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)).  "Additionally,

'[c]ourts should look to the totality of the circumstances and must be aware that probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.'" *Gaston*, 851 F. Supp. 2d at 788 (quoting *Panetta*, 460 F.3d at 395) (internal quotation marks omitted).

"Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was arguable probable cause to arrest." *Escalera* v. *Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Golino* v. *City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). "Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; arguable probable cause will suffice to confer qualified immunity for the arrest." *Id.* (internal quotation marks omitted).

### b.   Discussion

Summary judgment is granted as to Plaintiff's false arrest claims against Sergeant Gelfand and Officer Gonzalez. Plaintiff has "concede[d]" his false arrest claims against these Defendants. (Pl. Opp. 9). The Court must evaluate Defendants' motion for summary judgment, in consequence, as unopposed with respect to these two defendants. *See Klein* v. *Torrey Point Grp., LLC*, — F. Supp. 2d —, 2013 WL 5761401, at *11 (S.D.N.Y. Oct. 23, 2013) (construing as unopposed a summary judgment motion with respect to a claim the non-movant

had "offered to withdraw").  Plaintiff's motion "may properly be granted only if the facts as to which there is no genuine dispute," *Champion* v. *Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (per curiam), show that "the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

In a claim for false arrest, "each individual sued needs to have had personal involvement in the arrest in order to be held liable under 42 U.S.C. § 1983." *Travis* v. *Vill. of Dobbs Ferry*, 355 F. Supp. 2d 740, 747 (S.D.N.Y. 2005) (citing *Colon* v. *Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  Gelfand is not alleged even to have been present at the scene of the arrest.  (Def. 56.1(a) ¶ 5; Pl. 56.1(b) ¶ 5). Though Defendants' testimony is unclear on where Gonzalez was during the arrest, no testimony suggests that she was present when Plaintiff was actually taken into custody (*see* Minott Dep. 53:1-2; Duffy Dep. 26:20-34:22; Harris Dep. 34:8-37:10; Brizuela Dep. 34:6-40:19; Gonzalez Dep. 21:4-22:5), and the parties agree that she was not involved in Plaintiff's arrest (Def. 56.1(a) ¶ 6; Pl. 56.1(b) ¶ 6).  Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's false arrest claim as to Defendants Gelfand and Gonzalez and dismisses both parties from the case.

As to Sergeant Brizuela and Officers Harris and Duffy, however, issues of material fact foreclose summary judgment for either side on Plaintiff's false arrest claim.  The only contested element of Plaintiff's claim is whether Defendants had probable cause to arrest Plaintiff.  Defendants contend they did, and if not, at least had arguable probable cause and so should benefit from qualified immunity. (Def. Br. 11-15).  Plaintiff, unsurprisingly, submits just the opposite.  (Pl. Opp. 9-14; Pl. Br. 8-12).  The record before the Court admits of neither conclusion.

21

In their respective depositions, Defendants frequently contradicted each other on points both trivial and essential.  For example, three of the defendants presented wholly incompatible recollections of which officers spoke to the bank employee and when they did so.  Duffy testified that he and Gonzalez entered the bank together.  (Duffy Dep. 26:20-27:17).  Harris testified that he entered the bank with Duffy.  (Harris Dep. 28:21-29:7).  Gonzalez testified that Duffy entered the bank by himself and was joined by Harris.  (Gonzalez Dep. 24:24-25:3).  What matters here is not the specifics of the divergence in testimony, but rather the fact of the divergence; the failure of Defendants' memory here is illustrative of the factual issues precluding summary judgment.  Even the name of the unapprehended individual — Ra or Rod — is never established.

More importantly, summary judgment cannot issue because questions of material fact exist regarding what Defendants had seen and been told at the time they arrested Plaintiff.  For example, Defendants may have been warned of the involvement of two individuals, one of whom matched Plaintiff's description. Harris recalls he was advised of two individuals, one male and one female, in connection with the unfolding crime at the Chase Bank, and observed two individuals outside the bank who matched their descriptions.  (Harris Dep. 24:6-15).  But Defendants may also have been tipped only to the involvement of a female, giving less cause to suspect Plaintiff's involvement; Duffy, from whom Harris recalled receiving that description, testified that the tip information communicated to him identified one female and no other person.  (Duffy Dep. 18:17-19:17).

When Defendants arrived at the bank, they may have immediately suspected Plaintiff's involvement based on their observations. Duffy testified that he saw Plaintiff and Lindsay "hastily walking" outside the bank. (Duffy Dep. 103:2). Brizuela recalled that, on arriving at the scene, he saw two individuals walking together outside the bank who "were identified as" Plaintiff and Lindsay (Brizuela Dep. 33:12-13); he then observed the pair look towards where Brizuela was standing, speak to each other, and part company (*id.* at 33:14-16). Defendants could reasonably have found this behavior suspicious. However, Brizuela did not recall seeing Plaintiff running or walking "unnaturally fast." (*Id.* at 68:4-6). Indeed, Brizuela could not recall why he began following Plaintiff or why he ordered Plaintiff to stop on the street. (*Id.* at 34:11-13).

On the other hand, it is not clear whether Defendants actually saw Plaintiff and Lindsay together at all. Harris, Duffy, and Brizuela all testified that they saw Plaintiff and Lindsay walking away from the bank together, which could have provided an additional basis to believe Plaintiff was involved with Lindsay's crime. (Harris Dep. 24:6-15, 25:4-8; Duffy Dep. 25:17-19; Brizuela Dep. 33:12-16). Plaintiff insists that he left the bank before Lindsay and did not walk with her, and contends that the surveillance video supports his version of events. (Pl. Opp. 3 (citing Video 2 11:00:46–11:01:07 a.m.)). Though the surveillance video provides only a very limited view out the doors of the bank, it does appear to show Plaintiff exiting the bank and walking directly away. (Video 2 11:01:07 a.m.). Defendants rejoin that "it is entirely plausible that Plaintiff waited outside the bank for Ms. Lindsay and spoke to her after she exited." (Def. Reply 2).

Ultimately, the video record is far from clear, and certainly does not provide the level of factual certainty necessary to grant summary judgment for Plaintiff. Conversely, Defendants' "entirely plausible" conjecture cannot suffice to obviate the underlying intractable factual disputes. *See, e.g., Cameron* v. *City of New York*, 598 F.3d 50, 54 (2d Cir. 2010) (denying a motion for judgment as a matter of law on the basis of photographic evidence, where "[t]he photographs [did] not definitively rule out either side's version of events").

Nor does the record establish what additional knowledge officers gained after speaking with bank staff.  Duffy testified that the bank employee reported observing one woman and two men inside the bank (Duffy Dep. 26:20-27:17, 98:15-101:14), but Harris recalled that the bank employee only told him about Lindsay and no other individuals (Harris Dep. 31:5-25).  Separately, Brizuela recalled that Duffy "alerted" him that Plaintiff "was involved in the crime that occurred in the bank" (Brizuela Dep. 36:12, 16-17), but could not recall how Duffy communicated this information or what Duffy said (*id.* at 36:14-22).

Summary judgment is unavailable on a record this tangled.  Defendants maintain that they arrived at the bank already warned to look for a man and a woman; saw Plaintiff and Lindsay speaking outside the bank; saw Plaintiff and Lindsay apparently split up and attempt to leave the scene after observing Defendants' arrival; heard eyewitness testimony that Lindsay and Plaintiff spoke inside the bank during the attempted crime; and heard Plaintiff confess that he had driven Lindsay to the bank.  Some of these facts, considered individually, might not suffice to demonstrate probable cause.  (*See* September 7, 2012 Order at 10-11 n.4 ("Under New York law, '[a]lthough flight is a factor to consider on the

issue of probable cause, other facts must exist to show that a crime was committed and that defendant committed it.'" (quoting *New York* v. *Woldeguiorguis*, 195 A.D.2d 1004, 1005 (4th Dep't 1993)))).  As noted, however, courts must examine the "totality of the circumstances" in probable cause assessments and "must be aware that probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules."  *Panetta*, 460 F.3d at 395 (internal quotation marks and citation omitted).  Taken as a whole, the facts known to Defendants at the time may well have supplied probable cause.

Then again, on Plaintiff's version of the facts, Defendants may have arrested plaintiff without probable cause to do so.  After all, "mere presence … at a scene of criminal activity … [does not] establish[] probable cause," *People* v. *Flores*, 276 A.D.2d 710, 710 (2d Dep't 2000), and if Defendants only knew that Plaintiff was briefly present in the bank while Lindsay tried to cash a counterfeit check, without more, a reasonable jury might conclude that probable cause did not exist.  *See, e.g.*, *Douglas* v. *City of New York*, 595 F. Supp. 2d 333, 340 (S.D.N.Y. 2009) (concluding that summary judgment against the plaintiff's false arrest claim was unavailable where police maintained that plaintiff was present at a known drug address, held conversations with dealers and buyers, and acted as a lookout for drug transactions, in the face of plaintiff's testimony that he spoke briefly to a childhood friend and stood outside a dry cleaner for several minutes before being arrested); *see also* September 7, 2012 Order at 9-10 (concluding that allegations that "Lindsay attempted to cash a forged check, and that [Plaintiff]

25

and another man had entered the bank with her and remained inside the bank during the aborted transaction," would not constitute probable cause).[8]

Granting either party's motion for summary judgment, in other words, would require the Court to determine what officers knew on November 25, 2009, and when they knew it.  And "[t]he weighing of the evidence and the determination as to which version of the events to accept are matters for the jury." *Weyant*, 101 F.3d at 855.  Nor can the Court conclude that qualified immunity precludes Plaintiff's suit.  There is no dispute here that "the legal principles governing [D]efendants' conduct … were well established."  *Id.* at 858. Whether Defendants met those standards "depends on whether one believes their version of the facts."  *Id.*  A reasonable jury, crediting Plaintiff's account and settling on the least inculpating version of Defendants' testimony, "could find that '[D]efendants' actions were objectively unreasonable.'"  *Douglas*, 595 F. Supp. 2d at 341 (quoting *Lennon* v. *Miller*, 66 F.3d 416, 420 (2d Cir. 1995)).  That same jury could conclude that Defendants had at least "arguable probable cause," *Escalera*, 361 F.3d at 743, and find for Defendants on the grounds of qualified immunity.

---

[8]    Plaintiff insists that the Court's September 7, 2012 Order requires that he prevail on his summary judgment motion, inasmuch as the law of the case doctrine precludes reexamining those findings.  (Pl. Opp. 7-8; Pl. Br. 6-7).  The conclusions in that Order, however, are not preclusive here.  Previously, the Court held that "[t]he information that the Chase bank teller supplied to the police amounts to no more than mere presence," and so could not by itself provide probable cause.  (September 7, 2012 Order at 10).  Here, though Plaintiff continues to insist on a version of events substantially similar to "mere presence," Defendants variously have testified that they were tipped to the presence of a man and a woman, saw Plaintiff and Lindsay leaving the bank together and speaking before separating, received eyewitness testimony that Plaintiff spoke to Lindsay while she tried to cash the check, and heard Plaintiff confess that he drove Lindsay to the bank and knew the unapprehended individual allegedly responsible for providing the forged check. The Court's prior ruling simply does not apply with so many varying factual contentions at play.

Thus both summary judgment motions are denied with respect to Plaintiff's false arrest claim, except that, as noted above, Defendants' motion is granted as to Gelfand and Gonzalez.

### 3. Summary Judgment Is Denied as to Both Parties on Plaintiff's Claim of Malicious Prosecution against Officer Duffy

Contested issues of material fact also remain with respect to Plaintiff's malicious prosecution claim against Duffy.  Both pending motions for summary judgment are accordingly denied on this issue as well.

### a. Section 1983 Claims for Malicious Prosecution

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law." *Fulton* v. *Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) (citations omitted); *see also Singer* v. *Fulton Cnty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) ("A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of seizure.  This requirement is necessary to ensure that the § 1983 plaintiff has suffered a harm of constitutional proportions — *i.e.*, a harm cognizable under § 1983." (internal quotation marks and footnote omitted)).

"Under New York law, the elements of a malicious prosecution cause of action are: '[i] the initiation or continuation of a criminal proceeding against plaintiff; [ii] termination of the proceeding in plaintiff's favor; [iii] lack of probable cause for commencing the proceeding; and [iv] actual malice as a motivation for defendant's actions.'" *Richardson* v. *City of New York*, No. 11 Civ. 2320 (LGS),

2013 WL 6476818, at *6 (S.D.N.Y. Dec. 10, 2013) (quoting *Jocks*, 316 F.3d at 136).  Additionally, a plaintiff must assert that there was "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman* v. *New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

"Under New York law, police officers can 'initiate' prosecution by filing charges or other accusatory instruments." *Cameron*, 598 F.3d at 63; *see also Cooper* v. *City of New York*, No. 12 Civ. 8008 (SAS), 2013 WL 5493011, at *4 (S.D.N.Y. Oct. 2, 2013) ("'In malicious prosecution cases brought against police officers, plaintiffs have demonstrated that officers initiated criminal proceedings by having the plaintiff arraigned, by filling out complaining and corroborating affidavits, and by signing felony complaints.'" (quoting *Mitchell* v. *Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006))).

"The existence of probable cause is a complete defense to the claim, and an indictment by a grand jury creates a presumption of probable cause," *Gannon* v. *City of New York*, 917 F. Supp. 2d 241, 244 (S.D.N.Y. 2013), which may be rebutted only "by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith,'" *Savino* v. *City of New York*, 331 F.3d 63, 69 (2d Cir. 2003) (quoting *Colon* v. *City of New York*, 60 N.Y.2d 78, 82 (1983)).  The plaintiff has the burden of rebutting the presumption, and must do so with more than "mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." *Id.* at 73 (quoting *Bryant* v. *Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)).

However, "[w]here there is some indication ... that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome." *Manganiello* v. *City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (quoting *Boyd*, 336 F.3d at 77); *see also Rothstein* v. *Carriere*, 373 F.3d 275, 282-83 (2d Cir. 2004) ("Thus, in order for a plaintiff to succeed in a malicious prosecution claim after having been indicted, 'he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" (quoting *Colon*, 60 N.Y.2d at 82)).

By contrast, "'[a] lack of probable cause generally creates an inference of malice.'" *Manganiello*, 612 F.3d at 163 (quoting *Boyd*, 336 F.3d at 78). "Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Lowth* v. *Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli* v. *Stamberg*, 377 N.E.2d 975, 976 (N.Y. 1978)).

"The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury* v. *Wertman*, 721 F.3d 84, 95 (2d Cir. 2013). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd*, 336 F.3d at 76; *see also Posr* v. *Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir.

1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that [the charged individual] could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim...."); *Mazyck* v. *Johnson*, No. 08 Civ. 548 (CPS) (SMG), 2009 WL 2707360 (E.D.N.Y. Aug. 25, 2009) ("As the Second Circuit made clear in *Boyd*, the question is not whether there exists probable cause to prosecute, but rather whether there is probable cause to *believe that a prosecution will succeed*." (emphasis in original)).

Because "'accusers must be allowed room for benign misjudgments,'" the New York Court of Appeals has held that the law "'places a heavy burden on malicious prosecution plaintiffs.'" *Rothstein*, 373 F.3d at 282 (quoting *Smith–Hunter* v. *Harvey*, 95 N.Y.2d 191, 195 (2000)). Malicious prosecution defendants can also benefit from qualified immunity. *See Boyd*, 336 F.3d at 75 (citing *Martinez* v. *Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). "Arguable probable cause to charge exists where, accounting for any new information learned subsequent to an arrest, 'it was not manifestly unreasonable for [the defendant officer] to charge [the plaintiff]' with the crime in question." *Jean* v. *Montina*, 412 F. App'x 352, 354 (2d Cir. 2011) (summary order) (quoting *Lowth*, 82 F.3d at 572).

### b.   Discussion

Defendants first contend that Duffy did not initiate Plaintiff's prosecution for these purposes because "'New York law imposes a presumption that a prosecutor exercises his own independent judgment in deciding to prosecute a criminal defendant.'" (Def. Br. 16 (quoting *Gilman* v. *Marsh & McLennan Cos.*,

*Inc.*, 868 F. Supp. 2d 118, 128 (S.D.N.Y. 2012)); *see also* Def. Opp. 9-10).  But it is well-established that a criminal complaint filed by a police officer can serve as the initiating act for malicious prosecution purposes.  *See Cameron*, 598 F.3d at 63 ("As a matter of law, [the officer defendants]' filing of the Criminal Court Complaint initiated the prosecution against [the plaintiff].").  Duffy's role in Plaintiff's prosecution makes Duffy vulnerable to an otherwise substantiated malicious prosecution claim.

With respect to the remaining elements of Plaintiff's malicious prosecution claim, however — whether Duffy had probable cause to initiate the prosecution and whether it was initiated with malice — issues of material fact remain.  First, there is a presumption of probable cause in the prosecution when a plaintiff is indicted by a grand jury.  *Green* v. *Montgomery*, 219 F.3d 52, 60 n.2 (2d Cir. 2000).  This presumption of probable cause may be overcome "'only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.'"  *Rothstein*, 373 F.3d at 282-83 (quoting *Colon*, 60 N.Y.2d at 82).  If unrebutted, the presumption precludes maintaining a malicious prosecution claim.  *See Bernard* v. *United States*, 25 F.3d 98, 104 (2d Cir. 1994)).

Plaintiff points to *Cox* v. *County of Suffolk*, a case from outside this District, for the proposition "that where a grand jury indictment is reviewed by a state judge and dismissed due to total lack of evidence in support of one of the elements of the crime charged, the presumption of probable cause raised by that indictment will fall."  827 F. Supp. 935, 939 (E.D.N.Y. 1993).  The result in *Cox* is

31

surprising, given the clarity with which the New York Court of Appeals has held

that the presumption of probable cause may be unseated "'only by evidence

establishing that the police witnesses'" acted in bad faith in connection with the

grand jury proceeding. *Rothstein*, 373 F.3d at 283 (quoting *Colon*, 60 N.Y.2d at

82). Nor is it clear that the *Cox* court correctly read the New York State case from

which it inferred its conclusion. *Cox* observed that "*Colon* ... cites *Boose*

approvingly for the proposition that a presumption of probable cause may

disappear where an indictment is superseded by a no bill." *Cox*, 827 F. Supp. at

939. Yet the referenced decision of the Appellate Division, *Boose* v. *City of

Rochester*, holds no such thing. First, *Boose* dealt with a circumstance in which

the grand jury itself "superseded its original indictment three weeks later with a

no bill." 71 A.D.2d 59, 69 (1979). Second, as *Cox* itself acknowledged, *Boose*

came to no conclusion about the effect of that superseding no-bill because there

was "sufficient evidence of bad faith on the part of the ... police officers to

overcome the presumption of probable cause." *Cox*, 827 F. Supp. at 939.[9]

That being said, the intuition underlying *Cox*'s approach has merit. If the

presumption of probable cause derives from the premise that "'the Grand Jury

acts judicially,'" *Cox*, 827 F. Supp. at 938 (quoting *Colon*, 60 N.Y.2d at 82),

---

[9]    Apart from a brief reference in this Court's September 7, 2012 Order, the rule announced
in *Cox* appears to have been cited on only three occasions and never applied. *See Kanciper*
v. *Lato*, No. 13 Civ. 871 (ADS) (WDW), 2013 WL 5963080, at *14 (E.D.N.Y. Nov. 7, 2013)
(noting that it was "unclear" whether the facts matched those confronted in *Cox* and
instead rejecting the presumption of probable cause on the basis of police misconduct);
*Felmine* v. *City of New York*, No. 09 Civ. 3768 (CBA) (JO), 2011 WL 4543268, at *12
(E.D.N.Y. Sept. 29, 2011) (finding that *Cox* was not relevant where the prosecutor moved
voluntarily to dismiss the indictment due to lack of critical testimony); *Ukatu* v. *United
States*, No. 92 Civ. 4874 (JBW) (RLM), 1995 WL 311360, at *6 n.7 (E.D.N.Y. May 12, 1995)
(observing in passing that the implicated facts were "in contrast to" those encountered in
*Cox*).

perhaps that presumption should not attach when the Grand Jury has indicted a person against whom no evidence of wrongdoing whatsoever exists. *But see Kaley* v. *United States*, 134 S. Ct. 1090, 1098 (2014) ("The grand jury gets to say — without any review, oversight, or second-guessing — whether probable cause exists to think that a person committed a crime.").

Still, the facts here would seem to be significantly different from that "no evidence" hypothetical. The state court judge apparently dismissed the Indictment because she found that "[t]here was not enough evidence against" Plaintiff. (3/16/10 Tr. 2:5-6). This is obviously not the same thing as the "total lack of evidence" that *Cox* discussed. 827 F. Supp. at 939. On the contrary, Plaintiff's Indictment was dismissed merely for lack of sufficient evidence to sustain a conviction. But "the standard for probable cause is lower than that for conviction," and "'innocent behavior frequently will provide the basis for a showing of probable cause....'" *United States* v. *Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008) (quoting *Illinois* v. *Gates*, 462 U.S. 213, 243 n.13 (1983)). This dismissal "meant only that 'the People lacked evidence to establish a prima facie case of guilt.'" *Blasini* v. *City of New York*, No. 11 Civ. 3022 (SAS), 2011 WL 6224605, at *5 (S.D.N.Y. Dec. 14, 2011) (quoting *Colon*, 60 N.Y.2d at 84)). Accordingly the dismissal does not serve to rebut the presumption of probable cause normally arising from the grand jury indictment. *Id.*

The question remains, however, whether Plaintiff can rebut the presumption of probable cause by adducing "evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified

33

evidence, that they have withheld evidence or otherwise acted in bad faith."
*Colon*, 60 N.Y.2d at 82-83.  Here, issues of material fact require the Court to deny
both sides' motions.  Plaintiff "has alleged misleading actions by [Officer Duffy],
and those facts are still in dispute."  *Llerando-Phipps* v. *City of New York*, 390 F.
Supp. 2d 372, 383 (S.D.N.Y. 2005).  He submits that Officer Duffy introduced at
least two false, inculpating pieces of evidence to the Grand Jury via the Criminal
Complaint.  First, Plaintiff accuses Duffy of fabricating that the bank employee
observed Lindsay, Plaintiff, and an unidentified male enter the bank together, and
saw Plaintiff and the third individual remain inside the bank while Lindsay
sought to cash a forged check.  (Pl. Opp. 18 (quoting Criminal Complaint 1); Pl.
Br. 14-15 (same)).  Plaintiff contends that these averments contradict Duffy's
testimony contained in the Search Warrant Affidavit, which reports only that the
bank employee observed "Lindsay leave the bank window and walk to the
vestibule and speak to a tall, African-American male standing in the vestibule and
then return to the bank window."  (Search Warrant Affidavit ¶ 7b).

Duffy's testimony on this score is certainly inconsistent.  Duffy testified
that the Search Warrant Affidavit contained a complete and comprehensive record
of the bank employee's observations.  (Duffy Dep. 64:25-67:6).  Duffy also later
swore that, as far as he could recall, the Criminal Complaint accurately described
what the bank employee told him.  (*Id.* at 97:7-105:5).  These contradictions are
irreconcilable at the summary judgment stage.  (*See* Def. 56.1(a) ¶ 36; Pl. 56.1(b)
¶ 36).  Plaintiff argues as a last-ditch effort that because the surveillance video
validates the report contained in the Search Warrant Affidavit and contradicts the
report contained in the Criminal Complaint, the Court should rule that Duffy

fabricated the latter.  (Pl. Opp. 19; Pl. Br. 15).  But the question here is not what actually took place, but what Duffy was told.  "'When information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubt as to the person's veracity.'"  *Gaston*, 851 F. Supp. 2d at 788 (quoting *Feehan*, 278 F. App'x at 49).  Plaintiff has suggested no reason why, if indeed Duffy heard this report from the bank employee, he should have doubted her reliability.  (*See* Def. Opp. 11-12).  And of course, "[t]he weighing of the evidence and the determination as to which version of the events to accept are matters for the jury."  *Weyant*, 101 F.3d at 855.  It must be left to the jury to determine what version of Duffy's testimony to accept and, on the basis of that conclusion, whether Duffy acted in bad faith to such a degree as to overcome the presumption of probable cause.  *See Manganiello*, 612 F.3d at 162.

Second, Plaintiff asks the Court to find the Criminal Complaint sufficiently fraudulent to rebut the presumption of probable cause based on its report that Duffy "observed [Lindsay], [Plaintiff,] and the … unapprehended male exiting the [bank] and," when they observed Duffy, "each ran in a different direction."  (Pl. Opp. 19-20; Pl. Br. 16-17 (quoting Criminal Complaint 2)).  Duffy testified that he "did not see [the suspects] individually run."  (Duffy Dep. 102:2; *see also id.* at 102:11-12 ("If we're talking about the word run, I did not see them run.")).  Duffy also testified that he saw the three individuals together when they were leaving the bank (Duffy Dep. 102:22-24), and that he observed "two out of the three of them hastily walking, if not running" (*id.* at 102:25-103:3).  The difference, Duffy implied, was a matter of "the length of their stride," which he did not recall.  (*Id.*

at 103:2-3).  Duffy acknowledged that he did not see the unapprehended male apart from Plaintiff and Lindsay after leaving the bank.  (*Id.* at 103:21-25).

The difference here turns on whether Duffy's use of the word "run" and his inconsistent report of which individuals he saw at different times were inculpating fabrications sufficient to substantiate a finding of bad-faith action in procuring Plaintiff's indictment.  This question is a close one.  Nonetheless, the Court cannot conclude as a matter of law that this element of the Criminal Complaint constituted bad-faith action as contemplated in *Colon*.  Duffy testified that he saw the three individuals together on his way into the bank and saw two of those three walking with haste when he returned outside.  The record elsewhere contains testimony that Plaintiff and Lindsay were walking together, observed Defendants, spoke, and parted in different directions.  (Brizuela Dep. 33:14-16).  Plaintiff once again seeks to prove that Duffy's reported observations "are false" by relying on the surveillance video.  (Pl. Reply 8).  Yet the surveillance video's limited perspective outside the bank leaves it useless in determining the critical facts regarding where and with whom Plaintiff walked while Defendants were arriving.

In short, a reasonable jury could very well conclude that this element of the Criminal Complaint constitutes bad-faith action sufficient to rebut the presumption of probable cause.  *See Brandon* v. *City of New York*, 705 F. Supp. 2d 261, 274 (S.D.N.Y. 2010) ("Accordingly, when the Court considers Stambuk's and Brandon's testimony in combination with Salim's testimony, the Court moves beyond a simple conflict of stories or mistaken memories and into the possibility

that Salim did not observe Brandon toss the bag of cocaine but lied in order to secure an indictment.").

On the other hand, a jury could also conclude that Duffy was no more than negligent in failing to advise the Assistant District Attorney who drafted the Criminal Complaint that the word "run" was inaccurate.  (*See* Def. Opp. 12). *Colon*'s requirement of "conduct undertaken in bad faith," 60 N.Y.2d at 83, cannot be satisfied by a showing of mere negligence.  *See Manganiello*, 612 F.3d at 165 (finding officer defendant liable when he had "misrepresented the evidence to the prosecutors … or made statements that were false, and engaged in such misconduct *knowingly*" (emphasis added)); *Savino*, 331 F.3d at 72-74 (holding that *Colon*'s requirement was not satisfied where police failed to uncover and reveal to the grand jury that one officer had potentially exculpating eyewitness testimony); *cf. O'Neill* v. *Krzeminski*, 839 F.2d 9, 11 n.1 (2d Cir. 1988) ("Negligence is not a basis of liability for constitutional torts."); *Zahrey* v. *City of New York*, No. 98 Civ. 4546 (DCP) (JCF), 2009 WL 1024261, at *14 (S.D.N.Y. Apr. 15, 2009) ("Negligence cannot support a constitutional tort or a malicious prosecution claim.").

The record here is troubling.  Given the factual inconsistencies and unclear record, as well as the "'heavy burden'" on malicious prosecution plaintiffs to prove their case, *Rothstein*, 373 F.3d at 282 (quoting *Smith–Hunter*, 95 N.Y.2d at 195), the Court cannot conclude that Officer Duffy, as a matter of law, procured the indictment against Plaintiff by acting in bad faith.  Nor can the Court conclude that Duffy is free from liability.  A jury must resolve conflicting accounts of the evidence in order to establish whether the evidence provided to the prosecutor

and the grand jury was false at all.  "Therefore the issue of probable cause cannot be resolved on summary judgment.'"  *Brandon*, 705 F. Supp. 2d at 274 (quoting *Boyd*, 336 F.3d at 77). [10]

Accordingly, both motions for summary judgment as to Plaintiff's claim for malicious prosecution against Duffy are denied.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED as to Plaintiff's false arrest claim against Defendants Gelfand and Gonzalez.  The Clerk of Court is respectfully directed to terminate these Defendants as parties in this case and amend the case caption accordingly.

Defendants' motion for summary judgment and Plaintiff's motion for summary judgment are both DENIED as to Plaintiff's false arrest claim against Defendants Duffy, Harris, and Brizuela and as to Plaintiff's malicious prosecution claim against Defendant Duffy.  The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 47 and 56.

---

[10]    Defendants did not argue that qualified immunity precluded Plaintiff's malicious prosecution claim.  Even had they done so, qualified immunity would still be unavailable. "[W]here, as here, there is a question of fact as to whether defendants acted with malice in initiating a prosecution against plaintiffs, summary judgment on qualified immunity would be inappropriate."  *Davis* v. *City of New York*, 373 F. Supp. 2d 322, 338 (S.D.N.Y. 2005); *see also Manganiello*, 612 F.3d at 165 (finding qualified immunity unavailable when an officer defendant "misrepresented the evidence to the prosecutors").

The parties are hereby ORDERED to appear for a conference on May 13, 2014, at 3:00 p.m., in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, to discuss scheduling trial in this action.

SO ORDERED.

Dated:      April 8, 2014
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge